# EXHIBIT 1

Robert F. Kethcart (#023939)
Ryan J. Regula (#028037)
Charles F. Hauff, Jr. (#014465)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren, Suite 1900
Phoenix, Arizona 85004-2202
Telephone: 602.382.6000
Email: rkethcart@swlaw.com
　　　　rregula@swlaw.com
　　　　chauff@swlaw.com
Attorneys for Supima



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| SUPIMA, | No. CV2020-002764 |
|---|---|
| Plaintiff, | **COMPLAINT** |
| v. | *Commercial Court Assignment Requested* |
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, | |
| Defendant. | |

For its Complaint against defendant Philadelphia Indemnity Insurance Company ("Philadelphia"), plaintiff Supima alleges:

### Introduction

1. This is an action to recover from Philadelphia approximately $3 million of "Defense Costs" that Supima incurred after May 26, 2017, defending against the spurious claims brought against Supima in an arbitration entitled *Tradeline Enterprises Pvt. Ltd. v. Jess Smith & Sons Cotton, LLC, J.G. Boswell Co., and Supima*, before the American Arbitration Association's International Centre for Dispute Resolution ("ICDR"), Case No. 01-16-003-8669 (the "*Tradeline* case"). Philadelphia promised to pay these "Defense Costs" on behalf of Supima under the Not-for-Profit Directors & Officers Liability Insurance coverage part of the insurance policies that

Philadelphia issued to Supima, including Policy No. PHSD1146497, which had a Policy Period of July 1, 2016, to July 1, 2017. However, Philadelphia refuses to pay these "Defense Costs," breaching its promises to Supima and necessitating this action to compel Philadelphia to live up to its obligations.

## The Parties, Jurisdiction, Venue, and Tier

2. Supima is an Arizona non-profit corporation with its principal place of business in Tempe, Arizona.

3. Philadelphia is a Pennsylvania corporation with a principle place of business in Pennsylvania.

4. Philadelphia is an insurance company authorized to sell and issue insurance policies in the State of Arizona.

5. This Court has personal jurisdiction over Philadelphia and subject matter jurisdiction over this action. Venue is proper in this Court.

6. Pursuant to Arizona Rule of Civil Procedure 26.2, this case should be assigned to Tier 3.

## Supima Loyally Purchased Eleven Years of Seamless D&O Insurance Coverage from Philadelphia

7. For eleven consecutive years, from October 2007 through July 2018, Supima purchased seamless Directors' and Officers' Liability Insurance from Philadelphia under insurance policies that Supima loyally renewed with Philadelphia each year. These policies included:

    a. Policy No. PHSD557349 with a Policy Period of 10/06/2010 to 10/06/2011 (the "2010–11 Policy"),

    b. Policy No. PHSD656385 with a Policy Period of 10/06/2011 to 10/06/2012 (the "2011–12 Policy"),

    c. Policy No. PHSD783800 with a Policy Period of 10/06/2012 to 07/01/2013 (the "2012–13 Policy"), a true copy of which is attached to this Complaint as Exhibit A,

      d.    Policy No. PHSD846084 with a Policy Period of 07/01/2013 to 07/01/2014 (the "2013–14 Policy"),

      e.    Policy No. PHSD946976 with a Policy Period of 07/01/2014 to 07/01/2015 (the "2014–15 Policy"),

      f.    Policy No. PHSD1056941 with a Policy Period of 07/01/2015 to 07/01/2016 (the "2015–16 Policy"),

      g.    Policy No. PHSD1146497 with a Policy Period of 07/01/2016 to 07/01/2017 (the "2016–17 Policy"), a true copy of which is attached to this Complaint as Exhibit B, and

      h.    Policy No. PHSD1259381 with a Policy Period of 07/10/2017 to 07/01/2018 (the "2017–18 Policy").

8. In exchange for this insurance coverage, Supima timely paid all required premiums for coverage to Philadelphia.

9. Each of the above policies includes a Non-Profit Organization Directors & Officers Liability Insurance coverage part ("D&O Insurance"). (*See* Exhibit A, starting at p. 26 of 59, and Exhibit B, starting at p. 27 of 63.)

10. On the first page of the Flexi Plus Five coverage form included in each of the above policies, Philadelphia declared:

> **EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS IS A CLAIMS-MADE POLICY.**
>
> **CLAIMS-MADE POLICIES ONLY COVER THOSE CLAIMS MADE AGAINST THE INSURED DURING THE POLICY PERIOD.**

(*See* Exhibit A at p. 26 of 59, and Exhibit B at p. 27 of 63.)

11. In the D&O Insurance in each of the above policies, Philadelphia promised to pay, on behalf of Supima, "Loss from Claims made against [Supima] during the Policy Period . . . and reported to [Philadelphia] pursuant to the terms of the policy, for a D&O Wrongful Act."

12. The term "D&O Wrongful Act" is broadly defined in the above policies to include any actual or alleged "act, error, omission, misstatement,

- 3 -

neglect, breach of duty or Personal & Advertising Injury committed or attempted . . . by [Supima]."

13. The term "Personal & Advertising Injury" is defined in the above policies to include any actual or alleged "oral or written publication of material that slanders or libels a person or entity or disparages a person's or entity's goods, products or services."

14. The term "Loss" is defined in the above policies to include "Damages" and "Defense Costs."

15. The term "Defense Costs" is defined in the above policies to include "any reasonable and necessary legal fees and expenses incurred in the defense of a Claim, whether by [Supima] with [Philadelphia's] consent or directly by [Philadelphia], in the investigation, adjustment, defense and appeal of a Claim."

16. "Defense Costs" are in addition to and are not subject to the limits of liability in the above policies.

17. Under the policies identified in Paragraph 7 above, Philadelphia promised to advance "Defense Costs" to Supima as they were incurred in defending against a "Claim."

18. The term "Claim" is defined in the 2012–13 Policy to mean:

> B. **Claim** means for the purposes of Parts 1 [the D&O Insurance], 2, 3 and 5:
>
>    1. Any written demand for monetary or non-monetary relief; or
>
>    2. Any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal therefrom), which subjects an **Insured** to a binding adjudication of liability for monetary or non-monetary relief for a **Wrongful Act**; or
>
>    3. Any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured**.
>
> However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.
>
> [By Endorsement:] **Claim** will also mean any criminal proceeding commenced by the return of an indictment.

- 4 -

19. Between the 2013–14 Policy and the 2014–2015 Policy, Philadelphia surreptitiously amended the definition of "Claim" in the policies by a new endorsement.

20. Under the 2016–17 Policy, the term "Claim" was defined by endorsement to mean:

> **IV. AMENDMENT OF DEFINITIONS**
>
> Part 6 Common Policy Definitions, is amended as follows:
>
> A. Item B. **Claim** is deleted in its entirety and replaced by the following:
>
> **Claim** means for the purposes of Parts 1, 2, 3 and 5:
>
> 1. Any of the following:
>
>    a. Any written demand for monetary or non-monetary relief (including injunctive); or
>
>    b. Any civil proceeding, including any appeals therefrom, commenced by the filing, notice or service of compliant, pleading, summons or similar document; or
>
>    c. Any criminal proceeding, including any appeals therefrom, commenced by the return of an indictment or the filing of notice of charges or similar document; or
>
>    d. Any formal administrative, judicial, regulatory or tribunal proceeding, including any proceeding before the Equal Employment Opportunity Commission or any similar governmental agency, commenced by the filing of notice of charges, formal investigative order, service of summons, subpoena or similar document; or
>
>    e. Any arbitration, mediation or similar alternative dispute resolution proceeding commenced by receipt of a demand for such proceeding,
>
>    Against an **Insured** for a **Wrongful Act**; or
>
> 2. Any written request to toll or waive any statute of limitations applicable to any actual or potential suit or cause of action against an **Insured**.
>
> However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.
>
> A **Claim** shall be considered made when an **Insured** first receives notice of the **Claim**.

- 5 -

**The *Tradeline* Case and Supima's Request for Coverage**

21. On September 8, 2016, Tradeline Enterprises Pvt. Ltd. ("Tradeline") filed a Demand for Arbitration with the ICDR against Jess Smith & Sons Cotton, LLC, J.G. Boswell Co., and Supima (the "Demand for Arbitration"), which commenced the *Tradeline* case.

22. On May 15, 2017, Tradeline filed a Statement of Claim with the IDCR (the "Statement of Claim").

23. In the *Tradeline* case, and as set forth in the Demand for Arbitration and Statement of Claim, Tradeline sought damages from Supima based on various alleged acts, errors, omissions, misstatements, misleading statements, and breaches of duty by Supima, as well as alleged written publication of material by Supima that supposedly disparaged Tradeline's goods and products, as well as Tradeline's allegation that Supima breached the License Agreement between Supima and Tradeline by supposedly improperly revoking Tradeline's license to use the SUPIMA® trademark.

24. The Demand for Arbitration that Tradeline filed with the ICDR on September 8, 2016, was a "Claim" made by Tradeline against Supima during the Policy Period of the 2016–17 Policy for a "D&O Wrongful Act."

25. Tradeline's Demand for Arbitration and the Statement of Claim both were filed with the ICDR during the Policy Period of the 2016–17 Policy.

26. Supima reported the *Tradeline* case to Philadelphia in writing on May 26, 2017.

27. No exclusions in the 2016–17 Policy applied and precluded coverage for all of the damages being sought from Supima in the *Tradeline* case.

28. Supima provided Philadelphia with a copy of the Statement of Claim on May 30, 2017.

29. On May 31, 2017, Philadelphia sent Supima a "Loss Acknowledgement Letter," which acknowledged that Philadelphia had received Supima's notice of claim and request for coverage.

30. Nine months passed before Supima heard from Philadelphia again. During the nearly nine months between May 31, 2017, and February 23, 2018, Philadelphia did nothing in connection with the *Tradeline* case. The assigned adjuster (James E. Turner) did not contact Supima. Philadelphia did not request any information from Supima. Philadelphia did not let Supima know where or how to submit invoices for payment. From May 31, 2017, through February 23, 2018, Philadelphia failed to comply with its obligations under Ariz. Admin. Code R20-6-801(E)(4), (F), and (G)(1).

31. After nine months of silence, on February 28, 2018—which was the third day of the arbitration hearing in the *Tradeline* case—Philadelphia finally sent Supima a letter acknowledging that the *Tradeline* case was a "Claim" made against Supima for a "D&O Wrongful Act" and stating that Philadelphia was "considering reimbursement of defense costs" in connection with the *Tradeline* case.

### Philadelphia Terminates Supima's Insurance with Philadelphia

32. On April 18, 2018, Philadelphia mailed a "Notice of Nonrenewal of Insurance" to Supima, advising Supima that Philadelphia was not going to let Supima renew its insurance policies with Philadelphia any longer, after its 2017–18 Policy expired. The stated reason for the nonrenewal was: "***due to loss ratio – 4,309% as of 4/17/2018 due to Director & Officer(D&O) reserve of $1,000,000.***"

### Philadelphia Improperly Denies Supima's Request for Coverage

33. Approximately two weeks after sending the Notice of Nonrenewal, on May 4, 2018, Philadelphia informed Supima it was denying Supima's request for coverage in connection with the *Tradeline* case.

34. The sole basis for Philadelphia's denial was its incorrect assertion that a letter dated May 2, 2013, from Tradeline's attorney to Supima—in which Tradeline's attorney notified Supima that Tradeline wanted to arbitrate a dispute with Supima and asked Supima if it would agree to do so with a particular arbitrator—supposedly constituted a "Claim" made against Supima. This letter is referred to in this Complaint as the "May 2013 Letter." Philadelphia then asserted that the May 2013 Letter and the *Tradeline* case arose out of the same or similar alleged "wrongful acts" and therefore constituted one "Claim" that was first made against Supima in May 2013. Philadelphia further asserted that the May 2013 Letter was not timely reported to Philadelphia because it was not reported during the policy period of the 2012–13 Policy.

35. On May 11, 2018, one week after Philadelphia sent its denial letter, Supima received the Final Award from the arbitrators in the *Tradeline* case (the "Award"). In the Award, the arbitrators found in favor of Supima and against Tradeline.

36. As of the filing of this Complaint, Supima has incurred nearly $3 million of "Defense Costs" in connection with the *Tradeline* case after May 26, 2017.

37. Supima has demanded payment from Philadelphia for the "Defense Costs" that Supima incurred in connection with the *Tradeline* case after May 26, 2017, but Philadelphia has failed and refused to pay.

38. Philadelphia's denial of coverage and failure to pay the "Defense Costs" that Supima incurred in connection with the *Tradeline* case after May 26, 2017, are breaches of Philadelphia's contractual obligations under the 2016–17 Policy and/or under the 2012–13 Policy.

### The May 2013 Letter Was Not a "Claim"

39. Philadelphia's assertion that the May 2013 Letter was a "Claim" as defined in the 2012–13 Policy or the 2016–17 Policy is incorrect.

40. The May 2013 Letter did not commence or constitute an "arbitration proceeding . . . which subjects an Insured to a binding adjudication of liability for monetary or non-monetary relief for a Wrongful Act." Supima did not become part of a "proceeding" that subjected Supima "to a binding adjudication of liability for monetary or non-monetary relief for a Wrongful Act" until Tradeline filed its Demand for Arbitration with the ICDR on September 8, 2016.

41. The May 2013 Letter was not an "arbitration, mediation, or similar alternative dispute resolution proceeding commenced by receipt of a demand for such proceeding." An "arbitration, mediation, or similar alternative dispute resolution proceeding" was not "commenced" against Supima until Tradeline filed its Demand for Arbitration with the ICDR on September 8, 2016.

42. The May 2013 Letter does not include any request to toll or waive a statute of limitations.

43. The May 2013 Letter was not a "criminal proceeding commenced by the return of an indictment."

44. The May 2013 Letter did not include a "written demand for monetary or non-monetary relief."

45. The May 2013 Letter did not include a request or demand for the payment of money from Supima.

46. The May 2013 Letter did not include a request or demand for any settlement from Supima.

47. The May 2013 Letter did not include a request or demand for any non-monetary relief from Supima.

- 9 -

48. Subsequent letters between Supima and Tradeline, and Tradeline's inaction towards Supima for three years after the May 2013 Letter, confirm that Tradeline's May 2013 Letter was nothing more than a request to select an arbitrator.

49. The May 2013 Letter from Tradeline was not a "Claim" as that term is defined in either the 2012–13 Policy or the 2016–17 Policy.

50. The first time that Tradeline made a "Claim" against Supima for a "D&O Wrongful Act," as those terms are defined in the 2012–13 Policy and the 2016–17 Policy, was when Tradeline filed its Demand for Arbitration with the ICDR on September 8, 2016, during the Policy Period of the 2016–17 Policy, and Supima reported Tradeline's "Claim" to Philadelphia in writing on May 26, 2017.

### Tradeline's 2016 Demand for Arbitration and the May 2013 Letter Are Not the Same "Claim"

51. Alternatively, in the event the May 2013 Letter were to be deemed a "Claim," the Demand for Arbitration that Tradeline filed with the ICDR in 2016 and the May 2013 Letter are not one and the same "Claim."

52. The 2012–13 Policy defines "Claim" in the disjunctive, defining a "Claim" as either "1. Any written demand for monetary or non-monetary relief; *or* 2. Any judicial, civil, administrative, regulatory, or arbitration proceeding (including any appeal therefrom), which subjects an Insured to a binding adjudication of liability for monetary or non-monetary relief for a Wrongful Act; . . . ." (emphasis added).

53. The 2016–17 Policy also defines "Claim" in the disjunctive, defining a "Claim" as either "a. Any written demand for monetary or non-monetary relief (including injunctive); *or* b. Any civil proceeding, including any appeals therefrom, commenced by the filing, notice or service of compliant, pleading, summons or similar document; *or* . . . e. Any arbitration,